UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:20-CV-00374-FDW-DSC

| | |
|---|---|
| PHILADELPHIA INDEMNITY INSURANCE COMPANY,<br><br>   Plaintiff,<br><br>vs.<br><br>RONIN STAFFING LLC and MARGRAET A. PHILLIPS,<br><br>   Defendants. | ORDER |

THIS MATTER is before the Court on the parties' Motions for Summary Judgment, (Doc. Nos. 42, 44), and the parties' Joint Motion to Continue Deadline for Submission of Jointly Proposed Voir Dire and Jointly Proposed Jury Instructions, (Doc. No. 53). The Motions for Summary Judgment have been fully briefed and all of the pending Motions are now ripe for review. For the reasons stated herein, the Court GRANTS Plaintiff's Motion for Summary Judgment, (Doc. No. 42), DENIES Defendants' Motion for Summary Judgment, (Doc. No. 44), and DENIES AS MOOT the parties' Joint Motion to Continue Deadlines, (Doc. No. 53).

## I.   BACKGROUND

### a. The Parties

Plaintiff Philadelphia Indemnity Insurance Company is an insurance company incorporated under the laws of Pennsylvania, with its principal place of business in Pennsylvania. (Doc. No. 1, p. 2). Defendant Ronin Staffing, LLC, ("**Ronin**") is a limited liability company organized and existing under the laws of California, with its principal place of business in California. Id. At all relevant times, Ronin was operating its business as a staffing agency in, *inter*

1

*alia*, North Carolina. Id. Defendant Margaret Phillips ("**Phillips**") is an individual domiciled in North Carolina. Id. In January 2013, Phillips was a North Carolina licensed Pharmacy Technician; At that time, Phillips had been a licensed pharmacy technician for nine years, with twenty-four years of pharmacy technician experience. (Doc. No. 44-4). In January 2013, Phillips was employed by Ronin as a temporary pharmacy technician, compounding and dispensing infusions and personal medications in Coram Specialty Infusion Services, LLC's ("**Coram**") Mecklenburg County facility. (Doc. No. 44-4, p. 3; Doc. No. 1-1, p. 2). At all relevant times, Coram supplied employees, agents, and temporary workers who compounded, formulated, prepared, and dispensed prescribed personalized medications and infusions, among other services, at pharmacy locations owned by Apria Healthcare Company. (Doc. No. 1, pp. 3-4). In accordance with a Staffing Company Agreement entered into on August 22, 2011, Ronin was to provide temporary employees in the Coram facilities. (Doc. No. 1, p. 4).

### b. The Underlying Lawsuit

In January 2013, Phillips was assigned to compound an intravenous hydrating solution containing 10% Dextrose for Karon Hogan ("**K.H.**"). Id. at p. 4. Instead of 10% Dextrose, however, the solution compounded allegedly contained almost 60% Dextrose. Id. Moreover, during Phillips compounding of the IV solution, she allegedly failed to secure a pharmacist's pre-check to assure proper components and formulas were used, along with additional pharmacist's checks during and after the compounding process. (Doc. No. 1-1, p. 33). When the resulting solution was given to K.H., he suffered permanent brain injury. (Doc. No. 1, p. 5). In May 2017, K.H. and his family filed a lawsuit against Coram for damages resulting from the incorrect compounding of the solution administered to K.H (the "**K.H. Lawsuit**"). Id. After the K.H. Lawsuit settled, Coram filed suit against, *inter alia*, Ronin and Phillips, seeking contribution from

2

Phillips and contribution, indemnification, and damages for fraud and negligent misrepresentation and unfair and deceptive trade practices from Ronin (the "**Underlying Lawsuit**"). Id. at pp. 6-7. The relevant allegations pled in the Underlying Lawsuit are fully described in the Complaint filed in the Underlying Lawsuit and include:

> 11. In January 2013, Ronin's business included hiring and employing healthcare professionals, including pharmacy technicians, and providing temporary workers to organizations such as Coram.
>
> 12. Ronin, through a Staffing Company Agreement with Corestaff listing Apria Healthcare Group Inc. ("Apria") and its subsidiaries as a "Customer," agreed to provide temporary worker Margaret Phillips as a Pharmacy Technician at Coram's Mecklenburg County facility to assist with the compounding and dispensing of infusions and personal medications in January 2013.
>
> 13. Defendant Margaret Phillips was a North Carolina licensed Pharmacy Technician in January 2013, who provided compounding services for K.H. in January 2013 as an employee of Ronin Staffing, LLC, and as an agent of Corestaff.
>
> 14. Defendant Margaret Phillips' actions as a licensed Pharmacy Technician constitute actions performed by a health care provider as defined by N.C. Gen. Stat. Sec. 90-21.11.
>
> …
>
> 28. Pursuant to the Management Services Agreement and the Staffing Company Agreement, Corestaff and Ronin respectively placed their agent Margaret Phillips to be a temporary worker at Coram to compound and dispense infusions and personal medications in or around January 2013.
>
> …
>
> 30. Coram provided IV solutions and other healthcare services to K.H. for the supplemental nutrition ordered by physicians. In December 2012, K.H.'s doctors prescribed a new hydrating fluid with normal saline and 10% Dextrose (D10½NS). This physician order was provided to Coram for it to prepare and dispense the D10½NS hydrating fluids to the patient K.H.

3

31. On or about January 4, 2013, Ronin's and Corestaff's temporary worker Margaret Phillips was the Pharmacy Technician assigned to compound K.H.'s D10½NS solution at Coram's facility. Pharmacy Tech Phillips selected bags of normal saline and D70 (70% Dextrose) to be mixed in the clean room according to a formula she entered into a pump that would create the D10½NS compounded solution.

32. Pharmacy Tech Phillips owed a duty to perform her job in accordance with the standard of care, and to use best judgment and properly apply knowledge and skill.

33. In violation of the standard of care, best judgment, and failing to properly apply knowledge and skill, Pharmacy Tech Phillips committed professional malpractice and acts of ordinary negligence when preparing the D10½NS as follows:

   a. She failed to secure pharmacists' pre-checks to assure proper components and formulas were used;

   b. She entered the incorrect values into the pump, transposing (swapping) the D70 and normal saline values, which created a dangerous mixture of the approximately 60% Dextrose instead of the physician prescribed 10% Dextrose;

   c. She failed to secure pharmacists' compounding check in the clean room which would have revealed her failure to setthe pump properly;

   d. She emptied the D70 and normal saline bags' contents, instead of securing a pharmacist check of intact bags, which would have visually revealed her gross error; and

   e. She failed to properly secure post compounding checks by pharmacists.

(Doc. No. 1-1, pp. 3-6).

### c. The Policies and the Present Action

In 2012, Plaintiff issued two insurance policies to Ronin, a Businessowners Policy (Policy No. PHSD715225) (the "**BO Policy**") and a Commercial General Liability Policy (Policy No.

4

PHPK882581) (the "**CGL Policy**," and together with the BO Policy, the "**Policies**"), both of which were in effect in January 2013. (Doc. No. 1, p. 7).

Each of the Policies provide for certain coverage as follows:

**A. Coverages**

    **1. Business Liability**

        a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury," "property damage" . . . to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury," "property damage" . . . to which this insurance does not apply. . . .

        b. This insurance applies:

            (1) To "bodily injury" and "property damage" only if:

                (a) The "bodily injury" or "property damage" is caused by an "occurrence" . . .; and

                (b) The "bodily injury" or "property damage" occurs during the policy period.

(Doc. Nos. 1-2, p. 49; 1-3, p. 111). The Policies further provide the following definitions:

    3. "Bodily injury":

        a. Means bodily injury, sickness or disease sustained by a person, and includes mental anguish resulting from any of these; and

        b. Except for mental anguish, includes death resulting from the foregoing (item a. above) at any time.

    12. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

    15. "Property damage" means:
        a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

5

> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(Doc. Nos. 1-2, pp. 61-62, 82; 1-3, pp. 124-25, 141-42).

The Policies also contain professional services exclusion which precludes coverage for the insured's professional liability. The language of the exclusions differ slightly, but each exclusion broadly excludes coverage for bodily injury due to the rendering or failure to render any professional service. Specifically, the BO Policy provides:

> **B. Exclusions**
>
> **1. Applicable To Business Liability Coverage**
>
> This insurance does not apply to:
>
> **j. Professional Services**
>
> "Bodily injury" ... due to rendering or failure to render any professional service. This includes but is not limited to:
>
> …
>
> (4) Medical, surgical, dental, x-ray or nursing services treatment, advice or instruction;
>
> …
>
> (9) Services in the practice of pharmacy; but this exclusion does not apply to an insured whose operations include those of a retail druggist or drugstore.

(Doc. No. 1-2, pp. 53-54). The CGL Policy, on the other hand, provides that "[w]ith respect to any professional services shown in the Schedule . . . [t]his insurance does not apply to 'bodily injury' . . . due to the rendering of or failure to render any professional service." (Doc. No. 1-3, p. 128). The Schedule further describes "professional service" as: "ANY AND ALL

6

PROFESSIONAL SERVICES FOR ALL PLACEMENT TYPES." Id. Neither of the Policies, however, further define the term "professional services."

When the Underlying Lawsuit was filed, Plaintiff agreed to defend Ronin and Phillips in the Underlying Lawsuit subject to a reservation of rights and is currently providing such defense. (Doc. No. 44-1, p. 4). Plaintiff now brings this action seeking a declaration of its obligations under the Policies. (Doc. No. 1, pp. 32-33). The only issue remaining for disposition is whether Plaintiff has a duty to defend Defendants in the Underlying Lawsuit.[1] Both sides now seek summary judgment. (Doc. Nos. 42, 44).

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The interpretation of an insurance policy, including the extent of the insurer's duty to defend, is a question of law that is appropriately decided by dispositive motion. See Harleysville Mut. Ins. Co. v. Packer, 60 F.3d 1116, 1121 (4th Cir. 1995); see also Westfield Ins. Co. v. Weaver Cooke Constr., 383 F. Supp. 3d 566, 572-73 (E.D.N.C. 2019).

## III. ANALYSIS

### a. Choice of Law

Before turning to the merits of the parties' Motions, the Court addresses the issue of which jurisdiction's substantive law should be applied in interpreting the Policies. Plaintiff asserts that California law should govern the matter because Ronin, the named insured of the Policies, is a California corporation and the relevant staffing agreement between Ronin and Corestaff was not entered in North Carolina. (Doc. No. 43, p. 8). Defendants, on the other hand, assert that North

---

[1] Plaintiff's claims against several other named Defendants have been dismissed, and the Court has denied Plaintiff's duty to indemnify claim as not yet ripe. (Doc. No. 40).

7

Carolina should control pursuant to N.C. Gen. Stat. § 58-3-1. (Doc. No. 44-1, pp. 8-10).

N.C. Gen. Stat. § 58-3-1 provides, in relevant part, that "[a]ll contracts of insurance on property, lives, or interests in this State shall be deemed to be made therein," and are governed by North Carolina law. Because of constitutional concerns, however, "application of [N.C. Gen. Stat. § 58-3-1] has been limited to situations where there is a 'close connection' between North Carolina and the interests insured by the policy." Contl. Cas. Co. v. Physicians Weight Loss Centers of Am., Inc., 61 Fed. App'x. 841, 844-45 (4th Cir. 2003). If such close connection exists, North Carolina law controls the interpretation of the relevant policy. Id. Furthermore, a choice of law analysis is necessary "only if the relevant laws of the different states lead to different outcomes." Direct Techs. Intl., Inc. v. Maxum Indem. Co, 418 F. Supp. 3d 112, 117 (W.D.N.C. 2019) (citing Perini/Tompkins Joint Venture v. Ace Am. Ins. Co., 738 F.3d 95, 101 (4th Cir. 2013)).

In the instant case, Defendants assert, and the Court agrees, there is a "close connection" between North Carolina and the interests insured by the Policies such that North Carolina law controls under N.C. Gen. Stat § 58-3-1. The Court further finds the law of California concerning the interpretation of insurance policies or an insurer's duty to defend does not conflict with the law of North Carolina. The Policies clearly insure the "interests" of Ronin in its provision of staffing services within North Carolina. See Church Mut. Ins. Co. v. Lake Pointe Assisted Living, Inc., 2021 WL 406597, at *3 (E.D.N.C. Feb 5, 2021); Hartford Fire. Ins. Co. v. St. Paul Fire and Marine Ins. Co, 606, 607 F. Supp. 2d 602 (E.D.N.C. 2009). Indeed, the Underlying Lawsuit – and consequently, the present suit – arose out of the alleged negligence of Phillips, a resident of North Carolina, in performing her duties as a pharmacy technician on behalf of Ronin in North Carolina. (Doc. No. 44-1, pp. 9-10). Accordingly, the requisite "close connection" between Ronin's interests and North Carolina exists. In addition, Plaintiff has failed to bring to the Court's attention California "decisions

8

plainly contradicting" the relevant law of North Carolina. See Sun Oil Co. v. Wortman, 486 U.S. 717, 730-731 (1988) ("it is not enough that a [] court misconstrue the law of another State. Rather, our cases make plain that the misconstruction must contradict law of the other State that is clearly established and that has been brought to the court's attention."). Plaintiff's mere insinuation that professional services exclusions are construed more broadly in California than in North Carolina does not sufficiently establish that the applicable law of the forums plainly contradict one another. Id. Accordingly, the Court concludes the law of North Carolina governs the Policies.

### b. The Professional Services Exclusion

#### i. Standards for Construction of Insurance Contracts

Judge Gates in the Eastern District has thoroughly explained the standard governing construction and application of insurance policies under North Carolina as follows:

> The principles governing construction of insurance contracts are well established under North Carolina law. "The construction and application of insurance policies to undisputed facts is a question of law for the court." *Kephart by Tutwiler v. Pendergraph*, 131 N.C.App. 559, 564, 507 S.E.2d 915, 919 (1998). The objective of construction is to determine the coverage intended by the parties when the policy was issued. *Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co.*, 276 N.C. 348, 354, 172 S.E.2d 518, 522 (1970). "If policy language is clear and unambiguous, the court's sole duty is to 'determine the legal effect of the language used and to enforce the agreement as written.'" *Pendergraph*, 131 N.C.App. at 564, 507 S.E.2d at 919 (quoting *Cone Mills Corp. v. Allstate Ins. Co.*, 114 N.C.App. 684, 687, 443 S.E.2d 357, 359 (1994)). However, where the policy language is ambiguous, such ambiguities must be resolved in favor of the insured. *Mastrom, Inc. v. Continental Cas. Co.*, 78 N.C.App. 483, 484, 337 S.E.2d 162, 163 (1985); *see also First Nat. Bank of Anson County v. Nationwide Ins. Co.*, 303 N.C. 203, 216, 278 S.E.2d 507, 515 (1981) (principle that policy should be construed in favor of coverage applies only when there is an ambiguity). "An ambiguity exists where, in the opinion of the court, the language of the policy is fairly and reasonably susceptible to either of the constructions asserted by the parties." *Maddox v. Colonial Life and Acc. Ins. Co.*, 303 N.C. 648, 650, 280 S.E.2d 907, 908 (1981).
>
> In interpreting an insurance policy, a nontechnical term for which no definition is provided is to be given its ordinary meaning unless the context in which the term is used in the policy requires that it be given a different meaning. *United Services Auto. Assn. v. Gambino*, 114 N.C.App. 701, 705, 443 S.E.2d 368,

9

371 (1994). "In addition, an insurance contract is to be construed as a reasonable person in the position of the insured would have understood it." *Id*., 114 N.C.App. at 706, 443 S.E.2d at 371.

Hartford Fire Ins. Co., 606 F. Supp. 2d at 607-08. Moreover, "the insurer bears the burden of establishing the existence and applicability of a policy exclusion, while the insured has the burden of proving that an exception to the exclusion exists and applies to restore coverage." Home Indem. Co. v. Hoechst Celanese Corp., 494 S.E.2d 774, 783 (N.C. Ct. App. 1998).

### ii. The Court's Construction of the Policies

Under the Policies, coverage is afforded for "bodily injury" that is caused by an "occurrence" during the Policy periods. (Doc. No. 1-2, p. 49; Doc. No. 1-3, p. 111). For purposes of this analysis, the Court assumes the Underlying Lawsuit is within the coverage of the Policies; Therefore, the critical issue is whether an exclusion in the Policies bars coverage.[2] Relevant here are the Policies professional services exclusions, which exclude coverage for Ronin's professional liability. Although the Policies contain professional services exclusions, the language of the exclusions differs slightly. Accordingly, the Court analyzes the policies separately.

#### 1. The CGL Policy

The Court first analyzes the CGL Policy. The CGL Policy's professional services exclusion is contained in an endorsement entitled "Exclusion – Designated Professional Services," and provides, in pertinent part:

> With respect to any professional services shown in the Schedule, the following exclusion is added to Paragraph 2., Exclusions of Section I – Coverage A – Bodily Injury and Property Damage Liability.
>
> This insurance does not apply to "bodily injury" … due to the rendering or failure to render any professional service.

---

[2] Because the Court ultimately finds coverage is barred under the Policies' professional services exclusion, it need not analyze whether the Underlying Lawsuit is within the coverage of the Policies.

10

(Doc. No. 1-3, p. 128). The schedule of the endorsement then goes on to describe professional services as: "ANY AND ALL PROFESSIONAL SERVICES FOR ALL PLACEMENT TYPES." Id. Despite this broad description of professional services, the CGL Policy does not otherwise define the term "professional services." Id. Nonetheless, the Court finds the language of the exclusion unambiguously includes Phillips' rendering or failure to render the compounding and dispensation of the IV solution.

Under North Carolina law, "a 'professional service' is generally defined as one arising out of a vocation or occupation invoking specialized knowledge or skills, and the skills are mental as opposed to manual." Duke Univ. v. St. Paul Fire and Marine Ins. Co., 386 S.E.2d 762, 765 (N.C. Ct. App. 1990). In Duke, a patient was injured when two employees dropped the patient to the floor while attempting to move her from a dialysis table to a wheelchair. Id. The alleged negligent conduct resulting in the injury included: (i) failing to lock the caster on the dialysis chair, (ii) failing to stabilize the chair by other means, or (iii) failing to adequately support the decedent as she rose. Id. at 766. The defendant insurer argued that it had no duty to defend the plaintiff because the plaintiff's policy excluded all coverage for "claims arising out of the providing or failure to provide professional services by [the plaintiff's] hospital operations." Id. The North Carolina Court of Appeals rejected this contention, finding none of the acts the hospital attendants negligently failed to perform – physically securing the chair and the patient – were "services for which professional training is a prerequisite to performance." Id. at 766. Specifically, the Court of Appeals explained, "[i]n this case, the decedent's injury did not result from the dialysis treatment itself but from her attempt to get out of the dialysis chair…. The performance of [the relevant acts] would not require any special skills or training… These tasks are purely manual and no special training is required for a person to know that a chair with casters may move when someone attempts to rise from it."

11

Id.

In attempting to persuade the Court to find the relevant acts in the case at bar were "manual" and comparable to those at issue in Duke, Defendants assert that Phillips was merely "engaged in a manual task commensurate with the skills required of any other occupation for the production or sale of a commodity." (Doc. No. 44-1, p. 15). The Court disagrees and is surprised by Plaintiff's contention that the acts of a pharmacy technician, in compounding and dispensing IV solution, are merely manual tasks that do not require mental skills. Moreover, Phillips' failure to obtain several pharmacist's checks before, during, and after her compounding of the solution were not "manual" failures, but instead were mental failures of a person who was professional licensed and trained as a pharmacy technician. (Doc. No. 44-4).

In Hartford Fire Ins. Co., the Eastern District explained the court in Duke "adopted the definition of 'professional services' set out in Marx v. Hartford Acc. & Indem. Co., [] 157 N.W.2d 870 (Neb. 1968)." Hartford Fire Ins. Co., 606 F. Supp. 2d at 610. Defendants, in attempting to broaden the scope of the Policies, further assert the alleged negligence of the insured's employee in Marx is indistinguishable from the present case. (Doc. No. 46, p. 5). The Court again respectfully disagrees. The act at issue in Marx was an employee's mistaken act of pouring benzine, instead of water, into a hot water sterilizer. Id. The Supreme Court of Nebraska held that "[t]he boiling of water for sterilization purposes alone was not an act requiring any professional knowledge or training." Id. at *14. The Court went on, "it was a routine equipment cleaning act which any unskilled person could perform. The act was not a part of any patient's treatment per se…. It was no more of a 'professional service' than the routine activity of a housewife engaged in sterilizing baby bottles or canning jars." Id. Accordingly, the Court found that the employee technician's act required no special training or professional skill "and in no sense constituted the

12

rendering or failing to render professional services." Id. (internal citations omitted).

Here, in contrast, the relevant acts – the compounding and dispensing of a prescribed IV solution – were not routine acts which any unskilled person could perform. Indeed, compounding IV solution is regulated by federal and state law and cannot be performed by an untrained or unskilled individual. See 21 N.C.A.C. 46.2801 (Entitled "Compounding"; Setting forth guidelines for the preparation, labeling, and dispensation of compounded drug products); 21 N.C.A.C. 46.3301 (Entitled "Registration"; Setting forth registration requirements for pharmacy technicians and providing, in pertinent part, "It shall be unlawful to work as a pharmacy technician more than 60 days after expiration of the registration."). Moreover, although not dispositive, the Court finds significant that, at the relevant time of the events in the Underlying Lawsuit, Phillips had been a licensed pharmacy technician for nine years, with twenty-four years of pharmacy technician experience.³ (Doc. No. 44-4). This experience certainly shows the specialized knowledge and skill Ronin and Coram anticipated in hiring Phillips to perform the compounding and dispensing of IV solutions. In addition, unlike in Marx where the sterilization was not a part of any patient's treatment, Phillips' acts were doubtlessly part of K.H.'s treatment. Thus, despite Defendants assertions otherwise, Marx is entirely distinguishable.

Because the Underlying Lawsuit seeks to impose liability on Ronin for injuries resulting from Phillips' acts in compounding and dispensing the IV solution, the Court finds the acts fall within the professional services exclusion in the CGL Policy. Accordingly, Plaintiff does not owe a duty to defend Defendants in the Underlying Lawsuit under the the CGL Policy.

### 2. *The BO Policy*

---

³ The Court recognizes that judicial interpretation of "professional services" does not require a certain education or training level; However, such education or training may speak to the specialized knowledge and skill typically involved in a certain vocation or occupation. Duke, 386 S.E.2d at 765.

13

The Court now moves to the BO Policy. The professional services exclusion in the BO Policy provides, in pertinent part:

**B. Exclusions**

   **a. Applicable To Business Liability Coverage**

      This insurance does not apply to:

      **i. Professional Services**

         "Bodily injury" ... due to rendering or failure to render any professional service. This includes but is not limited to:

         …

         1. Medical, surgical, dental, x-ray or nursing services treatment, advice or instruction;

         …

         (10) Services in the practice of pharmacy; but this exclusion does not apply to an insured whose operations include those of a retail druggist or drugstore.

(Doc. No. 1-2, p. 54)

Similar to the CGL Policy, the language of the Policy provides the exclusion of coverage for bodily injury due to the rendering or failure to render *any* professional service. Id. For the reasons set forth above, the Court finds the Underlying Lawsuit also falls within the professional services exclusion in the BO Policy. With respect to the BO Policy, however, the Court's analysis does not stop there, as Defendants further assert an exception applies. To support this assertion, Defendants rely on the following language: "Services in the practice of pharmacy; but this exclusion does not apply to an *insured* whose operations include those of a retail druggist or drugstore." Id. (emphasis added). Defendants urge the Court to ignore the plain language of this exclusion and impermissibly broaden the coverage afforded under the BO Policy. Confusingly,

14

Defendants specifically assert, "[t]he question is whether either Defendants' 'operations *include those* of a retail druggist or drugstore"…. 'Include' is a very broad term.  This does not require operation as a retail druggist or drugstore.  It merely requires that some of the Defendants operations be the same as some operation engaged in by a retail druggist or drugstore." (Doc. No. 48, p. 7) (emphasis in original).  Plaintiff, on the other hand, asserts that the plain language of the BO Policy does not apply to either Ronin or Phillips. (Doc. No. 45, p. 15).  In January 2013, Ronin was a staffing agency, and Phillips was an individual employed as a temporary pharmacy technician. Id.  Although Ronin may have employed Phillips to work at a pharmacy, it does not follow that Ronin or Phillips' operation included those of a retail druggist or drugstore.  Accordingly, the Court agrees with Plaintiff and finds Defendants have failed to establish that the exception to the professional services exclusion applies.  See Hoechst Celanese Corp., 494 S.E.2d at 783.  Plaintiff, therefore, does not owe a duty to defend Defendants in the Underlying Lawsuit under the BO Policy.

## IV.  CONCLUSION

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment, (Doc. No. 42), is GRANTED, Defendants' Motion for Summary Judgment, (Doc. No. 44), is DENIED, and the parties' Joint Motion to Continue Deadlines, (Doc. No. 53), is DENIED AS MOOT.

The Court hereby DECLARES that:

(1) The Policies do not afford coverage to Defendants for the claims and damages alleged in the Underlying Lawsuit;

(2) Plaintiff is not required to defend Defendants in the Underlying Lawsuit; and

(3) Plaintiff is not obligated in any way to pay any damages that Defendants may become legally obligated to pay as a result of the Underlying Lawsuit.

15

The Clerk of Court is respectfully directed to enter final judgment in accordance with this Order and CLOSE THIS CASE.

IT IS SO ORDERED.

Signed: March 3, 2022

Frank D. Whitney
United States District Judge